**DON DAVIS PONTIAC, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Docket 78–4002, No. 978.**

United States Court of Appeals, Second Circuit.

Argued May 31, 1978.

Decided March 9, 1979.

Genuino J. Grande, Buffalo, N. Y. (Robert A. Doren, Buffalo, N. Y., of counsel, and Flaherty, Cohen, Grande & Randazzo, Buffalo, N. Y., on brief), for petitioner.

Charles P. Donnelly, NLRB, Washington, D. C. (Paul J. Spielberg, Deputy Asst. Gen. Counsel, John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on brief), for respondent.

Before FRIENDLY and TIMBERS, Circuit Judges, and HOFFMAN, Senior District Judge.*

WALTER E. HOFFMAN, Senior District Judge:

Petitioner, Don Davis Pontiac, Inc., seeks to review and set aside an order of the National Labor Relations Board (the Board), issued November 30, 1977, 233 NLRB No. 121, dismissing an unfair labor practice complaint filed against the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Amalgamated Local No. 55 (UAW). The complaint, filed June 21, 1976, charged that the UAW had picketed petitioner's place of business in order to achieve recognition as the bargaining agent in alleged violation of § 8(b)(7)(A) of the National Labor Relations Act, 29 U.S.C. § 158(b)(7)(A).[1] The administrative law judge (ALJ) found that the UAW had violated the provisions of the Act and issued a cease and desist order. The Board, sitting as a panel of three members, reversed, thus dismissing the complaint. We find the record wholly fails to support the Board's decision and order. Accordingly, we grant the petition to review, set aside the Board's order dismissing the complaint, and remand to the Board for the entry of an appropriate order consistent with this opinion.

## I.

Petitioner was an automobile dealership located on Bailey Avenue, Buffalo, New York, until June 11, 1976 and, at this location, its service employees were represented by UAW. Petitioner's collective bargaining agreement with UAW expired on March 20, 1976, but was renewed on a day-to-day basis thereafter until May 19, 1976[2] when, because petitioner's final offer was rejected, the UAW commenced picketing the Bailey Avenue location with signs bearing the legends: "UAW ON STRIKE FOR JUSTICE" and "UAW ON STRIKE FOR EQUITY." Petitioner makes no complaint as to this picketing. A strike followed at midnight, May 19, 1976.

For some months,[3] at least since November 7, 1975, petitioner had contemplated the sale of the Bailey Avenue dealership and the acquisition of another which was acceptable to the Pontiac Motor Division of General Motors Corporation. In April, 1976 petitioner was advised by Pontiac that the Al Ives Pontiac dealership in Tonawanda, New York, would probably be available and that petitioner would be considered as a candidate for the purchase of that dealership. Subsequent negotiations between petitioner and Ives were substantially completed on May 20, 1976. On the day prior thereto, May 19, 1976, petitioner notified the UAW that it was "contemplating a decision to terminate our Bailey Avenue shop operations for economic reasons." As a part and parcel of the purchase agreement with Ives, and as a condition precedent imposed at the insistence of Ives, peti-

---

* Of the United States District Court for the Eastern District of Virginia, sitting by designation.

1. Sec. 8(b)(7)(A) of the National Labor Relations Act, 29 U.S.C. § 158(b)(7)(A), provides:
   (b) It shall be an unfair labor practice for a labor organization or its agents—
   (7) to picket or cause to be picketed, or to threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:
   (A) where the employer has lawfully recognized in accordance with this subchapter any other labor organization and a question concerning representation may not appropriately be raised under section 159(c) of this title.

2. The record discloses that there were approximately ten negotiation meetings between March 18, 1976 and June 16, 1976.

3. Petitioner's vice-president testified that the issue of terminating the Bailey Avenue location and the purchase of a new business had been under consideration since January, 1974 due to long-term economic conditions at Bailey Avenue.

tioner was required to retain all of the Ives employees, including the unit represented by District 76, International Association of Machinists and Aerospace Workers, AFL–CIO (IAM), and to assume the IAM contract in its entirety.[4] Likewise, petitioner agreed to purchase the Ives inventory, its equipment, fixed assets and goodwill, along with assuming all of the Ives liabilities. The IAM had been certified as the exclusive bargaining representative of all service employees at the Ives place of business on October 14, 1975 and, at the time of petitioner's purchase, a collective bargaining agreement, effective February 4, 1976 continuing until February 4, 1979, was outstanding.

In response to petitioner's letter of May 19, the UAW advised that there was no purpose in meeting to discuss the situation as "the closing or termination of your shop operations is solely your decision to make," but the UAW nevertheless reserved the right to negotiate the effects of that decision.

On June 3, 1976, petitioner notified the UAW that it had decided to terminate the business effective June 11, 1976,[5] but invited the UAW "to meet and discuss with you the effects of our decision." On June 14, the purchase from Ives was consummated and, on the following day—June 15, 1976—petitioner commenced its operations at the Tonawanda location.[6]

The next day, June 16, 1976, pursuant to prior telephone conversations, petitioner's vice-president and its attorney went to the offices of the UAW and met with representatives of the Local and International.

The UAW was notified that operations had been terminated at the Bailey Avenue location, that petitioner had acquired the Ives operations on Niagara Falls Boulevard in Tonawanda, and that an agreement had been signed with IAM pursuant to petitioner's obligation to assume under the buy-sell agreement with Ives. Additionally, general questions were answered regarding "the nature of the closing of Bailey Avenue operations" and whether the UAW was going to "picket the Niagara Falls Boulevard operation." Also, the UAW requested petitioner to hire its members on a preferential basis, in response to which petitioner advised that they would be considered on a non-discriminatory basis without preferential treatment as, in the opinion of petitioner, to do otherwise would constitute an unfair labor practice.

Picketing, with the same legends on the signs, continued at the Bailey Avenue location until June 26, although petitioner had closed its operations at the end of the day on June 11. On June 21, 1976, the UAW commenced picketing the Tonawanda site, again with the same legends on the signs. On June 28 the UAW made an offer to return to work at the Tonawanda facility.[7] No picketing took place on June 29, but it was resumed on June 30 with picket signs carrying the legend: LOCAL 55 UAW PROTESTS THE REFUSAL OF DAVIS PONTIAC, INC. TO REEMPLOY ITS MEMBERS.

Picketing continued until July 19 when a United States district court issued a preliminary injunction against UAW prohibiting the picketing at the Tonawanda premises.

---

**4.** In fact, petitioner and the IAM executed an agreement on June 15, 1976 carrying into effect the recognition of the existing agreement between Ives and the IAM.

**5.** The Bailey Avenue location, at the time of the hearing, had been put up for sale or lease. This covered only the new car building at 2845 Bailey Avenue. The lease had expired for the used car lot at 2795 Bailey Avenue and was not renewed.

**6.** The precise distance between the Bailey Avenue location and the Tonawanda site is not

clear from the record. In argument, it was stated to be somewhat less than fifteen miles.

**7.** The letter of June 28 stated in part:

[T]he Union is terminating the strike and all striking employees are ready and willing to return to work unconditionally on Tuesday morning at 8:00 a. m., June 29, 1976.

Of course, the UAW was fully aware of the IAM agreement by this date and the fact that there were probably no existing vacancies since petitioner had retained the Ives employees in the bargaining unit in accordance with the buy-sell agreement.

## II.

Petitioner's original charge against the UAW was filed June 21, 1976.[8] The Regional Director, by letters bearing the same date, notified the UAW of the pendency of the charge. It is obvious that the UAW had notice of the pending charge filed by petitioner at the time the UAW suggested that the Bailey Avenue employees would return to work on June 29, and changed the legend on its signs on June 30, 1976. On June 25 the Regional Director filed his formal complaint and notice of hearing. The hearing was actually conducted on July 12, 1976.

On July 6, 1976, the UAW filed a petition for certification and an unfair labor practice charge against petitioner.[9] The charge against the petitioner was actually signed by the International Representative on June 28, 1976, but not filed until the date noted above. By separate letters to the UAW's counsel dated July 9, 1976, the Act-

ing Regional Director dismissed the petition as to § 9(c) and, as to the alleged violation of § 8(a)(2), refused to issue the complaint.[10]

## III.

We turn to the oral evidence at the hearing on July 12 which has not been heretofore mentioned, and certain concessions made in behalf of the UAW.

Sardes, the business representative for Local 55, UAW, testified before the ALJ that, even after petitioner notified the UAW that it had terminated the Bailey Avenue operations, he caused the pickets to be moved to Tonawanda, and that he was still concerned with negotiating a contract for petitioner's employees who formerly worked at the Bailey Avenue site (App. Vol. 1, pp. 110–111).

Prior to receiving testimony at the hearing, the ALJ stated his understanding of the issue to be "the object of the picketing

---

**8.** The specifics of the charge are—

Since on or about June 21, 1976, and continuously thereafter, it, a labor organization, by its officers, agents and representatives, has picketed Al Ives Pontiac (now Don Davis Pontiac, Inc.) at its premises at 2277 Niagara Falls Boulevard, Town of Tonawanda, New York, with an object of forcing or requiring Don Davis Pontiac, Inc. to recognize or bargain with United Automobile, Aerospace & Agricultural Implement Workers of America, and its Amalgamated Local No. 55, as the representative of his employees notwithstanding that District No. 76, International Association of Machinists and Aerospace Workers, AFL–CIO has been certified on October 14, 1975, and a question concerning representation may not appropriately be raised under Section 9(c) of the Act.

**9.** The specifics of UAW's charge against petitioner are—

(a) Since on or about May 19, 1976, the employer, by its officers, agents and representatives has dominated and assisted the formation among its employees of a labor organization known as Auto Mechanics' Lodge 1053, AFL–CIO and, at all times since that date, has interfered with the operation and administration of the charging party, all in violation of § 8(a)(2) of the Act.

(b) Since on or about June 29, 1976, the employer, by its officers, agents, and representatives has terminated the employment of all of the members of the bargaining unit represented by the charging party by re-

fusing the unconditional offer of each such employee to return to work and by unlawfully recognizing another labor organization to represent employees in the appropriate bargaining unit represented by the charging party because of the membership and activities of said employees on behalf of the charging party.

(c) Since on or about May 1, 1976 and at all times thereafter, the employer, by its officers, agents and representatives has refused to bargain collectively with the charging party, a labor organization chosen by a majority of its employees in an appropriate unit for the purpose of collective bargaining in regard to rates of pay, wages and other conditions of employment.

**10.** The refusal to issue the complaint was based largely upon *N. L. R. B. v. Burns International Security Services*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), holding that a "successor" employer is obligated to recognize and bargain with the duly certified representative of the predecessor employees. As to the alleged violations of §§ 8(a)(1), (3) and (5) of the Act, the Acting Regional Director stated that these matters were still being investigated. At the § 8(b)(7)(A) hearing on July 12, 1976 it was stated that an appeal had been noted. On June 30, 1977, the General Counsel denied the appeal holding that there was no merit to UAW's contentions that petitioner had violated §§ 8(a)(1), (2), (3) or (5) of the Act (App. Vol. IV).

and that it is the General Counsel's theory that the Company voluntarily and lawfully recognized the IAM at a time prior thereto, and that thereafter the picketing was for an object proscribed by 8(b)(7)." To this inquiry UAW's counsel replied: "The employer, it is our contention, had a bargaining agent; it was us. When they relocated, they still had a bargaining agent, and therefore could not recognize the other bargaining agent for the employees on Niagara Falls Boulevard" and "[O]ur picketing is being engaged in because, A, the employer failed to negotiate with us regarding the relocation, which he had an obligation to do, I believe. B, because he relocated and recognized another bargaining agent, in violation of our members' rights, was, in general, an 8(a)(1) violation, so in essence we are unfair labor picketors [sic] at this time" (App. Vol. I, pp. 7–8). To clarify this statement the ALJ inquired: "You are saying, in effect, that what he did was wrong and illegal, he really recognized another union at a time that valid questions concerning representation existed; is that right?" To which the UAW counsel replied: "Precisely."

### IV.

The ultimate question is whether the picketing by UAW at any time on or after June 21, 1976 was for recognitional purposes at a time when the petitioner had lawfully recognized another labor organization (IAM) and no question or representation could be appropriately raised under 29 U.S.C. § 159(c).

We shall initially explore the factual situation with respect to petitioner's acquisition of Al Ives Pontiac, Inc. The UAW collective bargaining agreement with petitioner, which expired March 20, 1976, contained a "successor" clause (App. Vol. II, pp. 24, 25) which provided for the sale of the business,

notice to UAW, and potential assumption by a purchaser of the bargaining agreement. The buy-sell agreement of May 20, 1976 between petitioner and Al Ives Pontiac, Inc. contained an express clause as follows: "Buyer shall, on the date of closing, assume all obligations of Seller, as of that date, under Seller's contract, dated February 4, 1976, with the Auto Mechanics Lodge Local 1053, International Association of Machinists and Aerospace Workers." The record discloses that a similar "successor" clause was contained in the agreement between Al Ives Pontiac, Inc. and the IAM, but this agreement is not in evidence.

The ALJ had no difficulty determining that petitioner was, in fact and law, a "successor" to Ives. Nor does the Board disagree with the ALJ's findings and conclusion that this was not a mere relocation but was, in fact, a successorship. Petitioner took over the Ives operation; it sold the same kind of automobiles;[11] new franchise agreements were executed; the Ives inventory, parts and equipment were acquired and used by petitioner;[12] all employees (except officers) of petitioner's Bailey Avenue operations were terminated as of the close of business on June 11. The Board obviously intimates that the ALJ was correct as it discussed the matter of a mere relocation and a duty to bargain about transfer rights in footnote 3 of its decision and order.

Effectively, the Board reversed the ALJ. The gist of the reversal lies in one paragraph as follows:

Looking at Davis's stance and the proposals made by Local 55 at this meeting [the meeting of June 16, 1976], we doubt the latter thought picketing could lead to another contract with Davis after June 16. We find the Union's immediate goal after June 16 was much more basic than obtaining a contract and was to influence Davis to grant the Bailey Avenue em-

---

11. At the Bailey Avenue location, petitioner sold and had separate franchise agreements with Pontiac and Fiat. At the Tonawanda location, petitioner executed separate agreements with Pontiac and Honda. The old agreements with Pontiac and Fiat were terminated by mutual agreement.

12. The record discloses that several pieces of equipment, not available at the Ives facility, were taken by petitioner to the new location. We deem this to be of no consequence.

**332**

ployees some sort of status as Tonawanda employees, either through reinstatement or the use of a preferential hiring list. The purpose was to preserve jobs Local 55 believed rightfully belonged to the Bailey Avenue employees. The only means available to the Union to achieve this result was through picketing Davis at Tonawanda. The June 29 offer to return to work further buttresses this view. We therefore find the object of Local 55's picketing after June 16 was job preservation. The picketing at Tonawanda therefore did not violate Section 8(b)(7)(A). (footnotes omitted)

Although acknowledging the weight that should be accorded to the Board's expertise in the field, we find ourselves in complete disagreement with the Board's "doubt" expressed herein. The record is replete with concessions and admissions, including the testimony of Sardes, the business representative for Local 55, which clearly point to a contrary conclusion. In fact, at no point does the evidence suggest that UAW's *only* purpose in picketing was job preservation.

It appears that the Board places great emphasis on the UAW's request at the June 16 meeting that the Bailey Avenue employees be granted preferential hiring rights. Other than this one request, the UAW made no further suggestion that preferential hiring rights be granted, but rather demanded mass reinstatement of the employee unit members on June 29 at a time when the UAW had already received notice of the charge filed by petitioner and, probably also, a copy of the complaint and notice of hearing. While the Board states that the June 29 offer to return to work further buttresses its view, we think that, under the circumstances of this case, it points to the fact that the UAW then recognized it may have already been guilty of an unfair labor practice by representational picketing and decided to modify the legend on its picketing signs.

In a footnote to its decision, in support of its finding that the sole object of the picketing was job preservation, the Board observes that the UAW filed charges on July 6, 1976, alleging that petitioner violated § 8(a)(2) by recognizing the IAM at Tonawanda, and § 8(a)(5) by refusing to bargain about the decision to relocate or the conditions under which the Bailey Avenue unit employees could transfer to the new location. 233 NLRB No. 121 n. 4. The fact that the employees may have had an honest belief that the IAM was not the proper bargaining representative and the Buffalo employees should have transfer rights does nothing to alter the fact that *an* object of the picketing was to obtain bargaining rights at Tonawanda, and that such picketing at that time was in violation of § 8(b)(7)(A).

Although the Board did state that the only object of picketing was job preservation, it does not point to the well-recognized rule as stated in *N. L. R. B. v. Suffolk County District Council of Carpenters, AFL–CIO*, 387 F.2d 170, 173 (2 Cir. 1967), where it is said:

> Recognition or organization need not be the sole or principal object of the picketing; it is sufficient to make out a violation if one of the union's objects is within the statutory language.

*Accord, Building Service Employees Union Local No. 87, AFL–CIO and Liberty House/Rhodes*, 223 NLRB 30, 91 LRRM 1588 (1976).

If this is not the law, it would be well-nigh impossible for an employer to ever prevail on a charge alleging a violation of § 8(b)(7)(A). On this record, while we are willing to concede that job preservation may have been one of the objectives, the primary objective was recognitional picketing.

The Board states that "Davis did not notify Local 55 of the purchase of Ives' Tonawanda dealership until the June 16 meeting."[13] This is a half-truth in that

13. Sardes admitted that he had seen the letter of June 3, and had knowledge of the fact that petitioner had already made a decision to sell,

prior to the meeting of June 16. App. Vol. I, pp. 112–113. The international representative stated that neither the International nor the

Davis did not notify the UAW of the "consummation" of the purchase, which took place on June 15, until the June 16 meeting. But the Board overlooks petitioner's letters of May 19 and June 3, the latter document advising the UAW that the Bailey Avenue operations would be terminated on June 11.

The Board's order is not supported by substantial evidence and is clearly arbitrary and unreasonable. We are reminded of the words of Judge Timbers in *Szabo Food Services, Inc. v. N. L. R. B.*, 550 F.2d 705, 707 (2 Cir. 1976), where it is said: "We hold that the Board, in making the determination referred to above, distorted some evidence and ignored or overlooked other contrary evidence."

### V.

Lastly, the Board relies upon *Waiters & Bartenders Local 500 (Mission Valley Inn)*, 140 NLRB 433, 52 LRRM 1023 (1963), and attempts to distinguish *International Longshoremen's and Warehousemen's Union Local 8 (Waterway Terminals Company)*, 193 NLRB 477, 78 LRRM 1573, *enforced* 473 F.2d 15 (9 Cir. 1973), without making any reference to the facts of these cases. See also 467 F.2d 1011 (9 Cir. 1972). Petitioner's brief correctly analyzes these cases; the Board's brief makes no realistic attempt to do so.

Aside from the unequivocal admission at the hearing before the ALJ by the business representative and counsel for UAW that the objective was to advance the recognitional and bargaining purpose—a point not discussed by the Board in its decision or in its brief on appeal—we believe that *Mission Valley Inn* is inapposite whereas *Waterway Terminals Company* is strikingly similar.

At the outset it is significant that picketing in *Mission Valley* commenced three months after the filing of representation petitions, and the picketing was obviously in protest of Mission's unfair labor practices, including a refusal to reinstate certain employees and a refusal to bargain at a time when the picketing was a protected concerted activity. Next, *Mission Valley* held that the only action taken by the union which had a bearing on the pending representation petition was its unsuccessful attempt to withdraw the petition. The only real bearing of *Mission Valley* on this case is the Board's reaffirmation of its repudiation of the holding in *Meat & Provision Drivers Union Local 626, International Brotherhood of Teamsters, etc. (Lewis Food Company)*, 115 NLRB 899, that any picketing demand is one for recognition or bargaining, see *Local 259 Int. Union, United Automobile, Aircraft and Agricultural Implement Workers of America, UAW, AFL–CIO (Fanelli Ford Sales, Inc.)*, 133 NLRB 1468, 49 LRRM 1021 (1961), and other cases, a position not argued by petitioner here.[14]

In contrast, the case at hand demonstrates that the UAW picketing was first timed with the inability to negotiate a new contract with petitioner. There was no change in the legend on the signs when the picketing transferred to Tonawanda. Later, on June 28, when the UAW first demanded reinstatement of the entire bargaining unit which had gone out on strike, the UAW did not mention that it no longer had a recognitional object, but continued to claim that it had the right to represent the unit employees at Tonawanda. As previously indicated, the testimony of Sardes convincingly establishes the motive and objective in picketing at Tonawanda even subsequent to June 28. The fact that the UAW misconstrued the law as to its rights in picketing is of no consequence. The fil-

---

Local had received any notification of the purchase of the Al Ives location. While she was technically correct in that the letter of June 3 does not mention Al Ives, she clearly was advised of the anticipated discontinuance of the Bailey Avenue shop operation as of June 11, 1976, as she confirmed this fact to petitioner by her letter of June 9 suggesting a meeting on June 16.

14. It is interesting to note that *Mission Valley Inn* was heard upon an agreed stipulation of facts, no witnesses testified, it was not disposed of by a trial examiner, and two Board members dissented.

ing of a representation petition and an unfair labor practice charge, both of which were denied by the General Counsel, while not conclusive, is competent evidence that the UAW challenged petitioner's recognition of the IAM and petitioner's refusal to bargain with the UAW as of July 6, several days after the change of legend on the picket signs. The Board had stated that it did not believe that the picketing must "be appraised against the background of the subsisting representation petition and hence be regarded as having a recognition or bargaining objective."

The Board expressed concern in *Fanelli Ford Sales, Inc.*, that a lawful objective—the reinstatement of employees—might be used as a pretext for a recognitional objective. In *Fanelli Ford Sales, Inc.*, the Board said: "But before we are willing to infer such broader objective, some more affirmative showing of such object must be made than exists here." That affirmative showing has been abundantly established in this case and, as we view it, without contradiction.

In the instant case there was a one-day break in picketing, but the objectives sought by UAW were not altered. It had full knowledge of petitioner's charges filed eight days earlier and, as conceded by UAW's counsel and business agent, recognition was the issue. In *W. D. Evans d/b/a The Evans Hotels operating the Bahia Motor Hotel*, 132 NLRB 737, there was a break of fifteen days before there was any outward manifestation of a change of objective from recognitional picketing when a letter was written by the union disavowing any claim of representative rights. The Board, in *The Evans Hotels*, held that the union

did not make clear what further remedial actions, short of recognition, it sought and, under these circumstances, found that the union's asserted change in object was a mere pretext since all unfair labor practice complaints had been settled or dismissed and there was therefore no action for the employer to take other than to engage in illegitimate bargaining. Here we have an eight-day delay in changing the legends seeking recognitional objectives, allegedly in the form of job preservation. We conclude that, under the facts of this case which are not controverted, the change of legend on the picketing signs and the letter from the union to petitioner were a mere pretext.

The Board's futile attempt to distinguish this case from *Waterway Terminals Company, supra*, is without explanation. Nor does the Board's brief on appeal purport to point out the distinction. In the Board's decision, all that is said is:

> We also believe this case is distinguishable from *International Longshoremen's and Warehousemen's Union Local No. 8 (Waterway Terminals Company)*, 193 NLRB 477 (1971). Chairman Fanning does not adhere to *Hotel, Motel, Restaurant Employees and Bartenders Union, Local 737 (Jet Services, Inc.)*, 231 NLRB No. 176 (1977), and agrees with Member Jenkins' dissent therein. Member Penello would distinguish that case for the reason that the object of Local 55's picketing changed after June 16.

The only mention of *Waterway Terminals Company* in the Board's brief on appeal is set forth in a footnote.[15] In *Waterway Terminals Company* the Board affirmed the

---

15. The brief on appeal notes in footnote 6 of said brief:

> In *Waterway Terminals*, the employer was a freight interchanger unloading freight from barges and reloading it in trucks or railcars. It subcontracted the barge unloading to one company and the railcar reloading to another. Each subcontractor's employees were unionized. Waterway took over the barge unloading company and eventually decided to terminate its contract with the railcar loading company. The union representing the railcar loading employees thereupon

. picketed Waterway, demanding as the price for withholding pickets an arrangement under which its members would effect a mass displacement of Waterway employees, who were represented by another union. The Board found that the inevitable consequence of Waterway's acquiescence in this arrangement would have been establishment of the respondent union as the dominant voice in representation matters among Waterway employees, an object tantamount to recognition. 193 NLRB at 486.

findings and conclusions of the trial examiner, and the Ninth Circuit, 473 F.2d 15, merely enforced the order directed to the union; hence we look to the trial examiner's decision for a discussion of the case. We find no fault with the Board's brief which summarizes the factual situation but we cannot dispose of this case without further comment.

The union in *Waterway Terminals Company* had initiated correspondence after the § 8(b)(7)(A) charge had been filed by the employer following commencement of picketing on the same day. The purpose of the correspondence was to negative recognitional picketing and merely seek reinstatement as full-time employees. On this point the trial examiner .found, as affirmed by the Board, "I am of the opinion that the correspondence initiated after the initial charge herein must be viewed with skepticism." Moreover, it is said: "Respondent [union] did, however, have ample basis for knowing that to grant its demands, Waterway would be required to abrogate employment, seniority and other contractual rights of the 60 or 70 IBU [another union] adherents who would, of necessity, be replaced by Waterway's acquiescence to Respondent's demands." In the present case the identical questions are presented. While the only communication from the UAW was the letter of June 28 advising that the strike was terminating and that all striking employees would return to work on June 29, it is clear that this occurred well after the charge had been filed on June 21. Like the trial examiner in *Waterway Terminals Company*, we view this communication with skepticism. Likewise, the UAW knew that petitioner could not possibly reinstate its Bailey Avenue shop employees as this would have required petitioner to discharge the employees represented by IAM, thereby resulting in an obvious unfair labor practice charge. As *Waterway Terminals Company* said: "In the circumstances defined, it is essential to conclude that the picketing which sought mass displacement of IBU-represented employees in favor of Local 8 members, and on terms agreeable to Local 8, had an immediate recognitional object and was not for the sole purpose of gaining 'reinstatement' or employment for Local 8 members." The petitioner's case is substantially identical. If the Board still adheres to *Waterway Terminals Company*, which apparently it does, we find no sound basis as to how and why it is distinguishable from the present case. In fact, the "successor employer relationship" was far more apparent in petitioner's case than in *Waterway Terminals Company*.

In *Hotel, Motel, Restaurant Employees and Bartenders Union Local 737 (Jet Services, Inc.)*, 231 NLRB 1049, 96 LRRM .1151 (1977), referred to in the Board's decision as indicative of a divided view of the members as to the vitality of that case, there was a settlement agreement but thereafter the union resumed picketing and also said that the picketing would cease when the employees were rehired. The Board, quoting *Gazette Printing Company*, 175 NLRB 1103, 71 LRRM 1161 (1969), said:

> We view it as highly significant in this case that the Union was not picketing for reinstatement of one or a small number of employees, but for a mass reinstatement of *all* strikers. Since the strikers were union adherents the immediate consequences of mass reinstatement would have been the reestablishment of the Union's earlier majority status. Under these circumstances we do not believe that the Union, in pressing for a mass reinstatement, can realistically be said to have only a future, but not a present, object of recognition.

In the present case the UAW had 20 employees in the bargaining unit. The IAM had 16. Obviously, to uphold the Board's decision in the instant case would lead to industrial strife, since the union certified at the previous work place no longer has exclusive bargaining rights and the employer has rightfully recognized a union certified to represent the employees in the place where it has become a successor.

## VI.

We agree that a reviewing court may not displace the Board's choice between two *fairly* conflicting views, even though the

court would justifiably have made a different choice had the matter been before it *de novo, Universal Camera Corp. v. N. L. R. B.,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and that the Board is not necessarily bound by the ultimate findings of the ALJ, but under the facts and existing law in this case there is no rational basis upon which the Board's decision dismissing the complaint can be upheld.

Petition to review granted, order set aside, and remanded to the Board for the entry of an order consistent with this opinion and granting petitioner appropriate relief.