**WATERWAY TERMINALS COMPANY,**
**Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 26630.

United States Court of Appeals,
Ninth Circuit.

Oct. 10, 1972.

Rehearing Denied Nov. 28, 1972.

James H. Clarke (argued), of Mc-Colloch, Dezendorf, Spears & Lubersky, Portland, Or., for petitioner.

Elliot Moore, Atty. (argued), Stanley R. Zirkin, Atty., Glen M. Bendixsen, Chief of Special Litigation, Marcel Mallet-Prevost, Asst. Gen. Counsel, Peter G. Nash, Gen. Counsel, NLRB, Washington, D. C., Robert J. Weiner, Officer in Charge, NLRB, Portland, Or., Charles M. Henderson, Director, NLRB, Seattle, Wash., Richard Carney, of Carney, Haley, Probst & Levak, Pozzi, Wilson & Atchison, Herndon & Ofelt, Portland, Or., for respondent.

Before DUNIWAY and TRASK, Circuit Judges, and FERGUSON,* District Judge.

TRASK, Circuit Judge:

This case comes before the court on the petition of Waterway Terminals Company (Waterway) to review a decision and order quashing notice of hearing issued by the National Labor Relations Board on August 27, 1970, at the conclusion of a hearing under Section 10(k) of the National Labor Relations Act, as amended (29 U.S.C. § 160(k)). The Board's Decision and Order quashing the notice of hearing is reported at 185 N.L.R.B. 35 (1970). If thereafter denied a motion for reconsideration and a motion to reopen the record. On December 11, 1970, the Board filed a motion to dismiss Waterway's petition for review in this court upon the ground that the decision in the Section 10(k) proceeding was not a final order subject to review. We denied that motion.

Taking the facts largely from the Board's statement, we note that the work involved is that of loading and unloading freight at Waterway's Front Street terminal in Portland, Oregon.

Waterway is a freight interchanger unloading freight from barges and reloading it upon trucks or railcars. Prior to the middle of 1968 it subcontracted most of the barge unloading to Western Transportation Company

(Western) and the reloading on railcars to Interstate Carloading Company. Western's employees were represented by the Inlandboatmen's Union (IBU), and Interstate's employees by the International Longshoremen's and Warehousemen's Union (ILWU).

In 1968, Waterway became Western's corporate successor. Shortly thereafter, Waterway and IBU negotiated a new collective bargaining agreement which provided, as did the preceding IBU-Western agreement, that employees of Waterway represented by IBU would handle the barge operations and place barge freight on a marked area from whence Interstate employees would load it into railcars.

In 1969, in response to Interstate's request for a rate increase, Waterway decided to perform the railcar work with its own employees and notified Interstate it was terminating that subcontract on October 31. Prior to the effective date of that termination ILWU acknowledged notice of the proposed change and wrote Waterway that:

"[W]e assume that those men [Interstate's] will continue to work in their present jobs, and that our collective bargaining agreement will remain in full force and effect.

"Please be advised that we are prepared to bargain with you in good faith.

"Will you please advise us as to time and place for our meeting, because it appears to us that time is of prime essence in this matter."[1]

By letter to IBU, however, Waterway agreed with IBU's claim to this railcar work which Interstate had been performing. It also informed ILWU that it would be guilty of an unfair labor practice if it negotiated with any other union than IBU. On November 1, Waterway took over the railcar functions pre-

---

* Honorable Warren J. Ferguson, United States District Judge, Central District of California, sitting by designation.

1. Letter of October 22, 1969. Petitioner's Brief at 13.

viously performed by Interstate employees.[2]

ILWU thereupon picketed Waterway with signs reading "Waterways [sic] unfair to Longshoremen—ILWU Local 8." Waterway and IBU filed charges of violation by ILWU of Section 8 (b)(4)(D) of the Act and the district court granted an injunction under Section 10(*l*) of the Act. Hearings were had pursuant to Section 10(k) at the conclusion of which the Board determined that the object of the picketing was to obtain reinstatement of Interstate employees under the existing collective bargaining agreement. Accordingly the Board concluded that no jurisdictional dispute existed within the meaning of Section 10(k) and quashed the notice of the 10(k) hearing previously issued.[3] This petition for review followed.

■ Initially the jurisdiction of this court is brought into question. Lack of jurisdiction was raised by motion and a motion to dismiss was denied. The point is renewed on appeal and our ruling is the same.

Section 8(b)(4)(D) defines actions which constitute unfair labor practices on the part of a labor organization.[4] However where disputes between two competing unions are concerned, Congress afforded a procedural opportunity for the two to settle their differences voluntarily rather than to undergo a lengthy and perhaps traumatic hearing which might satisfy no one and inflict unprovoked punishment upon the public and the employer in its course.[5] Section 10(k) provides that machinery.

Section 10(k) of the Act, 29 U.S.C. § 160(k), reads:

"Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of section 158(b) of this title, the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for

---

2. The Board stated that "[a]lthough Waterway also had to hire a substantial number of new employees to assist in performing these newly expanded duties, there is no evidence to warrant a finding that, but for one or two exceptions, it made any job offers to the former Interstate employees."

There is a dispute in the evidence as to this point. There was evidence that "the word was passed around" to a good many Interstate employees that work applications were being taken by Waterway. Several testified they did not apply because they might have to give up their ILWU rights. R.T. at 734, 769, 797, 817.

3. Two members of the five-member Board dissented.

4. Section 8(b) (4) (D) of the Act, 29 U.S.C. § 158, reads in part:
   "(b) It shall be an unfair labor practice for a labor organization or its agents—
   *   *   *   *   *
   "(4) (i) to engage in, or to induce or encourage any individual employed by

any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
   *   *   *   *   *
   "(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order of certification of the Board determining the bargaining representative for employees performing such work."

5. NLRB v. Radio & Television Broadcast Engineers Union, Local 1212, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961).

the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed."

Taking advantage of it, both Waterway and IBU, after the picketing began, filed charges alleging that ILWU had violated Section 8(b)(4)(D) of the Act by engaging in proscribed activity with an object of forcing or requiring Waterway to assign certain work in dispute to employees represented by ILWU rather than to employees represented by IBU.[6] The Board's Regional Director investigated the charges and found reasonable cause to believe that they were true; on December 10, the General Counsel on behalf of the Regional Director, sought and obtained from the district court a temporary injunction against the ILWU picketing and the Section 10(k) hearing proceeded. In the hearing before an official examiner, witnesses were sworn, over 800 pages of testimony were taken and numerous exhibits were introduced on behalf of the Board and the parties.

The majority members found that there was insufficient evidence to support the charge of a "traditional" jurisdictional dispute and quashed the notice of hearing[7] instead of determining the dispute.

The Board relies here upon the argument that under Section 10(f)[8] review lies only from a "final order of the Board," and that an order quashing a notice of hearing under Section 10(k) is not such a final order. Reliance is placed upon NLRB v. International Longshoremen's & Warehousemen's Union, 378 F.2d 33 (9th Cir. 1967), and upon a series of cases holding that the General Counsel's refusal to issue a complaint based upon an unfair labor practice charge and a Board representation petition under Section 9 of the Act is not reviewable.

We do not read NLRB v. International Longshoremen's & Warehousemen's Union, *supra*, nor the recent decision of this court in Henderson v. International Longshoremen's & Warehousemen's Union, Local 50, 457 F.2d 572 (9th Cir.

6. ILWU also filed charges with the Board alleging Waterway violations as a result of the same conflict. (Exh. 11). Its complaint asserted:
"Since on or about November 1, 1969, it has extended recognition to the Inland Boatmen's Union of the Pacific, Columbia River Division, for the operations of Interstate Carloading Company in Portland, Oregon, at a time when no members of IBU were employees of the operations.
"Since on or about November 1, 1969, it has discharged the employees of Interstate Carloading Company because of their membership in ILWU Local 8.
"Since on or about November 1, 1969, it has refused to bargain about its successor employer relationship for these operations with ILWU Local 8, the recognized representative of the employees of that operation."

7. "Here, the evidence is insufficient to establish a traditional jurisdictional dispute between two groups of employees. The employees represented by Local 8 were terminated during the term of an existing collective-bargaining agreement as a result of Waterway's reorganiza-

tion. The evidence bearing upon Local 8's objectives is limited to its letter of October 22, 1969, in which it merely demanded continued employment of those presently working and that the collective-bargaining agreement applicable to them be given force and effect. No other demands were made and none can be implied." International Longshoremen's & Warehousemen's Union Local 8 & Waterway Terminals Co. et al., 1970 CCH NLRB 28699, 28700.

8. Section 10(f) of the Act, 29 U.S.C. § 160(f) provides in pertinent part:
"(f) Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition praying that the order of the Board be modified or set aside."

1972), as supporting the Board's position. In both NLRB v. ILWU and in *Henderson* there was an actual award under Section 10(k). This court in NLRB v. ILWU and in *Henderson* was thereupon concerned with the consequences which flow from the award.

■ Nor do we find that this case is controlled by the absence of appealability of a Section 9 representation proceeding or the General Counsel's refusal to issue a complaint. In American Federation of Labor v. NLRB, 308 U.S. 401, 60 S.Ct. 300, 84 L.Ed. 347 (1940), the Court made the distinction plain as to the Section 9 argument.

"Here it is evident that the entire structure of the Act emphasizes, for purposes of review, the distinction between an 'order' of the Board restraining an unfair labor practice and a certification in representation proceedings. The one authorized by § 10 may be reviewed by the court on petition of the Board for enforcement of the order, or of a person aggrieved, in conformity to the procedure laid down in § 10, which says nothing of certifications. The other, authorized by § 9, is nowhere spoken of as an order, and no procedure is prescribed for its review apart from an order prohibiting an unfair labor practice." 308 U.S. at 409, 60 S.Ct. at 304.

The cases cited by the Board holding that the General Counsel's refusal to issue a complaint is not appealable, are likewise inapposite. In those instances no proceedings were instituted upon which review could have been based. This Section 10(k) proceeding is distinctly to the contrary. A proceeding was begun by the Regional Director; facts were developed and a record made, pursuant to formal charges instituted by all three interested parties. It was tantamount to a hearing on a complaint issued by the Regional Counsel because the Board is required to make a determination, NLRB v. Radio & Television Broadcast Engineers Union, Local 1212, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302

(1961), and that determination both completes the Section 10(k) proceedings, and resolves the Section 8(b)(4)(D) charge. In NLRB v. Plasterers' Local Union No. 79, 404 U.S. 116, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971), the Court said:

"But the § 10(k) decision standing alone, binds no one. No cease-and-desist order against either union or employer results from such a proceeding; the impact of the § 10(k) decision is felt in the § 8(b)(4)(D) hearing because for all practical purposes the Board's award determines who will prevail in the unfair labor practice proceeding. If the picketing union persists in its conduct despite a § 10(k) decision against it, a § 8(b) (4)(D) complaint issues and the union will likely be found guilty of an unfair labor practice and be ordered to cease and desist. On the other hand, if that union wins the § 10(k) decision and the employer does not comply, the employer's § 8(b)(4)(D) case evaporates and the charges he filed against the picketing union will be dismissed. Neither the employer nor the employees to whom he has assigned the work are legally bound to observe the § 10(k) decision, but both will lose their § 8(b)(4)(D) protection against the picketing which may, as it did here, shut down the job. The employer will be under intense pressure, practically, to conform to the Board's decision. This is the design of the Act; Congress provided no other way to implement the Board's § 10(k) decision." 404 U.S. at 126–127, 92 S.Ct. at 367.

To deny review of a refusal to proceed to award under a Section 10(k) proceeding is to nullify the effectiveness of Section 8(b)(4)(D). The only avenue to relief from a dispute under that section is by way of a Section 10(k) proceeding. An order quashing a notice of hearing under Section 10(k) therefore constitutes a "final order" as to the underlying charge based on Section 8(b) (4)(D). Appellee's argument would place the parties back to their orig-

inal position, *i. e.*, IBU claiming the work for its members and ILWU claiming the work for its members, and the employer and the public without power to solve the problem. Such is contrary to the scheme and purpose of Section 8(b)(4)(D) and Section 10(k). NLRB v. Plasterers' Local Union No. 79, 404 U.S. 116, 130, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971); NLRB v. Radio & Television Broadcast Engineers Union, Local 1212, 364 U.S. 573, 576, 580–581, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961); *cf.* Leeds & Northrup Co. v. NLRB, 357 F.2d 527 (3rd Cir. 1966). The Board's order was, as to this Section 8(b)(4)(D) dispute, a "final order of the Board."

Having decided that jurisdiction exists, we proceed to consider whether the dispute in this case is one which falls within the ambit of an unfair labor practice under Section 8(b)(4)(D).

The Board position is not that Section 8(b)(4)(D) is totally inapplicable.[9] It adopts the view that the remedy of Waterway is more properly under Section 8(b)(4), and that a "representational" issue is raised rather than a "jurisdictional" issue. The question whether a dispute is "representational" or "jurisdictional" is not of easy answer. Carey v. Westinghouse Electric Corp., 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1963). In *Carey,* the Court recognized that even though a dispute between unions might involve a representation issue, a violation of Section 8(b)(4)(D) may arise if a union pickets or uses other coercive means.

In speaking of the "blurred line" that often exists between work assignment disputes and controversies over which of two or more unions is the appropriate bargaining unit, the Court in *Carey* stated that:

"If this is truly a representation case, either IUE or Westinghouse can move to have the certificate clarified. But the existence of a remedy before

the Board for an unfair labor practice does not bar individual employees from seeking damages for breach of a collective bargaining agreement in a state court, as we held in Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246. We think the same policy considerations are applicable here; and that a suit either in the federal courts, as provided by § 301(a) of the Labor Management Relations Act of 1947 (61 Stat. 156, 29 U.S.C. § 185(a); Textile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972), or before such state tribunals as are authorized to act (Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483; Teamsters Local v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593) is proper, even though an alternative remedy before the Board is available, which, if invoked by the employer, will protect him." 375 U.S. at 268, 84 S.Ct. at 407.

Nor do we find the law to be that due deference to the expertise of the Board compels us to reject a litigant's resort to an applicable section of the Act because there is another that might be equally applicable. In NLRB v. Local 825, International Union of Operating Engineers, 400 U.S. 297, 306, 91 S.Ct. 402, 408, 27 L.Ed.2d 398 (1971), the Court said:

"The practices here were unfair under both sections and there is no indication that Congress intended either section to have exclusive application."

That relief may be parallel upon some facts in the representational and the jurisdictional sections of the Act does not mean that they are identical or mutually exclusive.

In McDonnell Co. & International Assn. of Machinists & Aerospace Workers, Dist. Lodge No. 90, and International Brotherhood of Electrical Workers, Local No. 1, 173 NLRB 225 (1968), the

9. "The crucial determination, therefore, is whether, as the Company asserts (Br. 27), the applicability of Section 8(b)(4)

(D) to the picketing is 'beyond question.'" Brief for Appellee at 19.

employer filed a petition to seek clarification of a craft unit of its electrical workers which had previously been certified to the Electrical Workers Union (IBEW). The Board noted approvingly that throughout several proceedings to resolve the dispute both unions involved had "laudably refrained from engaging in the type of conduct condemned by the Act's Section 8(b)(4)(D)." Id. at 226. In a footnote at this point the Board said:

> "That the issue resulting from the Employer's introduction of new . . . equipment which was never anticipated . . . at the time of the Board's earlier certifications of the competing unions could now be raised for Board consideration by strike action and a charge of a violation of Section 8(b)(4)(D) does not bar us from exercising our parallel authority under Section 9(b) on proper motion to clarify the certification on the basis of the full record now before us." 173 NLRB at 226 n.4.

Here it is undisputed that there were two discrete groups each insisting upon its sole right to perform the carloading duties; the IBU on behalf of its members who had a collective bargaining agreement with Waterway, and were then performing the work; and ILWU which insisted it had the right to have the work assigned to its members who had previously performed it as employees of Interstate. While the situation contains elements of representation, it does not exemplify the classic representation dispute where each of two vying unions insists that it represents the majority of the employees of a given employer.[10]

■ We readily recognize, as we should, that the findings of the Board with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. 29 U.S.C. § 160(e). NLRB v. International Longshoremen's & Warehousemen's Union, 378 F.2d at 35. Here the Board rejected Section 10(k) jurisdiction solely on the basis of Local 8's letter of October 22, 1969, *supra* note 1. It characterized this letter as one in which ILWU ". . . merely demanded continued employment of those presently working and that the collective-bargaining agreement applicable to them be given force and effect." Were this in truth the only evidence bearing on the issue of a jurisdictional dispute the bidding of the statute might well foreclose further examination of the Board's finding. But there was more. ILWU made no effort to obtain jobs on behalf of its Interstate employees which might become available under the new Waterway plan. On the contrary, it immediately began picketing. It also filed charges of unfair labor practices against Waterway with the Board under Section 8(a)(1)(2)(3) and (5), asserting among other things Waterway's refusal to bargain with ILWU Local 8, "the recognized representative of the employees of the operation." It sought no relief under the provisions of the Act for certification of its right to representation. 29 U.S.C. § 159. And the ILWU representative at the hearing formally stipulated that Local 8 "did and does claim juris-

---

10. That the parties considered the dispute one of jurisdiction is made clear by a stipulation entered into at the close of the Section 10(k) hearing:

"MR. POZZI: [Attorney for ILWU] We also have a stipulation, rather than calling a witness, as to the jurisdiction claim of work by Local 8 of the work involved in this dispute at 3838.

"HEARING OFFICER: What were the terms of the stipulation?

"MR. POZZI: That Local 8 does claim the work for its people, that these men claim their jobs. Was it any broader than that?

"MR. LUBERSKY: [For Waterway] You are proposing to stipulate that ILWU Local 8 did claim and does claim jurisdiction over the carloading jobs and functions at 3838 and 1788 Northwest Front. So stipulated.

"HEARING OFFICER: Thank you. The stipulation is received.

"MR. POZZI: I think that's all."

diction over the carloading jobs and functions at 3838 and 1788 Northwest Front." In the light of all this we are of a firm persuasion that the findings of the majority of the Board are not supported by substantial evidence on the record considered as a whole.

The difficulties involved in the semantics of a characterization of the dispute as "representational" or "jurisdictional" are somewhat clarified by measuring the fact situation against the language of the statute to determine whether a labor organization is "(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization . . . rather than to employees in another labor organization. . . ."

It appears clear that this is exactly what the undisputed facts disclose is the problem. We accordingly remand to the Board for a determination in accordance with the requirement of Section 10(k) of the Act, 29 U.S.C. § 160(k).

FERGUSON, District Judge (dissenting):

While I am in full agreement with the conclusion that the Board's order is subject to judicial review, I must respectfully dissent from that part of the majority opinion overturning the Board's order.

The evidence before the Board showed the following facts:

1. Prior to mid-1968, Waterway Terminals Co. ("Waterway") subcontracted most of its work at its two terminals in Portland, Oregon, to Western Transportation Co. and to Interstate Carloading Co. Western, whose employees were represented by the Inlandboatmen's Union of the Pacific, Columbia River Division ("I.B.U.") handled only barge freight at these sites while Interstate, whose employees were members of International Longshoremen's and Warehousemen's Union, Local 8 ("Local 8") performed the railcar operations.

2. At other Waterway sites, Western handled both barge and rail freight pursuant to a collective bargaining agreement which provided that employees represented by the I.B.U. would handle both kinds of freight.

3. In 1968, Western discontinued its shoreside operations and Waterway became its successor. Western's employees, both supervisory and nonsupervisory, were hired en masse by Waterway and performed the same functions that they had performed prior to the takeover.

4. Waterway then negotiated a new collective bargaining agreement with the I.B.U. which, in accordance with similar provisions in the old I.B.U.-Western contract, provided that employees represented by the I.B.U. would be entitled to both barge and rail work. However, Waterway continued to operate the principal terminal as in the past—that is, with Interstate employees handling the loading, unloading, cleaning and sealing of railcars.

5. In the fall of 1969, Waterway, in response to a rate increase request by Interstate, decided to adopt a more efficient method of operation to eliminate the double-handling of freight. It decided to integrate carloading with warehouse assembly and barge unloading by merging the job duties of all employees and performing the previously subcontracted railcar work with its own employees. Interstate was informed that the subcontract would be terminated, effective October 31, 1969.

6. On October 20, 1969, the I.B.U. wrote a letter reminding Waterway that the I.B.U. was the exclusive collective bargaining agent of all Waterway employees in the relevant unit classifications and stating that:

> "We assume that you intend to recognize that this work [carloading work] when performed by employees of Waterway Terminals belong [sic] to our union and is covered by our Collective Bargaining Agreement with your company."

7. On October 22, 1969, Local 8 wrote Waterway as follows:

"As a successor employer of our members at your carloading facility . . ., we assume that those men will continue to work in their present jobs and that our collective bargaining agreement will remain in full force and effect."

8. By letter of October 23, 1969, Waterway acceded to I.B.U.'s claim to the work and, several days later, informed Local 8 that it could not lawfully negotiate with any other union than the I.B.U.

9. Although additional workers were hired to handle the increased workload, former Interstate employees, with one exception, declined Waterway's solicitations to apply for the work. The one Interstate employee who did apply was offered employment, but turned it down.

10. After Waterway took over Interstate's railcar functions at the beginning of November, 1969, Local 8 commenced picketing Waterway with signs reading "Waterways [sic] Unfair to Longshoremen—ILWU Local 8".

11. On November 3 and 4, 1969, Waterway and I.B.U. filed charges with the Board in which they alleged that Local 8 had violated Section 8(b)(4)(D) of the Act. On November 14, 1969, the Board's Regional Director filed in the United States District Court for the District of Oregon a petition for injunction against Local 8's alleged unlawful conduct pursuant to Section 10(*l*) of the Act, on the ground that there was reasonable cause to believe that Local 8 was engaging in conduct in violation of Section 8(b)(4)(D). The court granted the injunction prayed for on December 10, 1969.

12. The unfair labor practice charges filed by Waterway and I.B.U. were consolidated by the Board for the purposes of hearing pursuant to Section 10(k) of the Act, and hearings were held on December 11, 12, 29, 30 and 31, 1969, and January 15 and 19, 1970. The Board found that the object of Local 8's picketing was to obtain reemployment or reinstatement of Interstate's employees previously performing railcar operations under the existing collective bargaining agreement. The Board concluded that no jurisdictional dispute existed within the meaning of Section 10(k) and quashed the notice of 10(k) hearing previously issued. The Board observed that its decision did not imply that Waterway had no remedy under Section 8(b)(7) of the Act, since the question whether the picketing may have had a recognitional objective was not before the Board.

13. On November 6, 1970, Waterway filed a charge in which it alleged that Local 8 had violated Section 8(b)(7) of the Act by continuing to picket Waterway's premises. A complaint issued, an injunction against Local 8 was obtained, and on October 1, 1970, the Board issued a decision finding that Local 8 had violated Section 8(b)(7)(A) of the Act by picketing Waterway with an objective of securing recognition at a time when Waterway had lawfully recognized the I.B.U. and a question concerning representation could not appropriately be raised. Enforcement of that order is now pending before another panel of this court.

To determine whether Local 8's conduct in picketing Waterway was in violation of Section 8(b)(4)(D), the Board had to resolve a single factual question, namely, what was the purpose and objective of the picketing. In order to answer this question, the Board was entitled to examine the nature and origin of the dispute between Local 8 and Waterway and to consider the totality of the union's conduct. NLRB v. Local 25, IBEW, 383 F.2d 449, 453 (2nd Cir. 1967). This it did in seven days of hearings. On the basis of these hearings and the evidence before it, the Board concluded that this was not a jurisdictional dispute within the meaning of Section 8(b)(4)(D). In the words of the Board:

"Here, the evidence is insufficient to establish a traditional jurisdictional dispute between two groups of employees. The employees represented by Local 8 were terminated during the

term of an existing collective-bargaining agreement as a result of Waterway's reorganization. The evidence bearing upon Local 8's objectives is limited to its letter of October 22, 1969, in which it merely demanded continued employment of those presently working and that the collective-bargaining agreement applicable to them be given force and effect. No other demands were made and none can be implied.

\* \* \*, \* \* \*

"On the basis of the foregoing, we find that Local 8's picketing of Waterway was solely for the object of preserving the carloading work for the employees who had been doing it and who had selected Local 8 to represent them and that such a dispute is not the type of controversy Congress intended the Board to resolve pursuant to Section 8(b)(4)(D) and Section 10(k) of the Act. Accordingly, we shall quash the Notice of Hearing." (Footnotes omitted.)

The Board's conclusion is based on extensive evidence and is clearly not erroneous. The Board's order should be upheld.

The petitioner has characterized the Board's decision as redefining a jurisdictional dispute to exclude "work preservation" disputes. The Board has done no such thing. The Board's decisions both prior and subsequent to the decision here under review clearly indicate that a "work preservation" exception to Section 8(b)(4)(D) has never been recognized. In this case the Board has merely concluded that, as a factual matter, the purpose of the picketing was not jurisdictional.

The petitioner would have this court adopt a rule that every dispute involving two competing employee groups is per se a jurisdictional dispute under Section 8(b)(4)(D). Such a simplistic rule makes no sense and would wreck havoc with the statutory scheme for resolving various types of disputes which arise between unions. Petitioner has lost sight of the fact that, although every jurisdic-

tional dispute necessarily involves at least two unions, not every dispute between two unions is necessarily jurisdictional. As the Board has noted in its brief:

"In short, if two discrete groups were vying for work which would be assigned to one or the other, the dispute probably would be jurisdictional. On the other hand, if no transfer were involved and Local 8 and I.B.U. both claimed to represent the employees currently doing the work, Waterway would probably concede that the dispute was representational and not jurisdictional. Where the employer is seeking to merge two groups and the dispute is over the survival of representational rights in the merged group, however, Waterway's assertion that the existence of a jurisdictional dispute is 'beyond question' hardly follows."

The Board has distinguished the factual situation in this case from the typical jurisdictional dispute on the basis of the following findings: (1) Waterway was not initially caught between claiming unions. It precipitated this dispute when it chose to change its method of doing business and terminate the subcontract with Interstate. (2) This was not a dispute in which two discrete groups were vying for work which would be assigned to one or the other. (3) Waterway was not seeking to reassign work from one group to another, but to merge the two union groups and eliminate one bargaining representative. (4) The effect of Waterway's action was to transfer railcar employees from one employer (Interstate) to another (Waterway) and to compel them to change their bargaining representative from Local 8 to I.B.U.

As the Supreme Court acknowledged in Carey v. Westinghouse Electric Corp., 375 U.S. 261, 268, 84 S.Ct. 401, 11 L.Ed. 2d 320 (1963), the line between essentially representational and jurisdictional disputes is "blurred". The blurred line is not a product of the law, but a product of the facts. The factual question

which must be answered in each case is, "What is the purpose of the picketing?" The line of demarcation is blurred in situations where the purpose of the picketing is not clear or where the picketing may serve several purposes. In such cases the National Labor Relations Board has the responsibility to resolve the factual questions and apply the law.

The Board has been entrusted by Congress with the duty to interpret and enforce the Act. Over long years of experience, dealing with thousands of concrete factual situations, the Board has acquired a deep understanding of labor relations and substantial expertise in applying the sometimes too rigid categories of the statutory scheme to diverse factual situations in a manner best calculated to further the policies of the Act. The courts have given recognition to this expertise by permitting the Board broad discretion to assert its jurisdiction "in any manner reasonably calculated to carry out its statutory duties". Optical Workers' Union v. NLRB, 227 F.2d 687, 691 (5th Cir. 1955), cert. denied, 351 U.S. 963, 76 S.Ct. 1027, 100 L.Ed. 1484 (1956).

In this case the Board made a factual determination as to the purpose of the picketing, which is supported by the evidence and which is clearly not erroneous. On the basis of that determination, it concluded that the dispute was not jurisdictional in nature. In a subsequent action, the Board determined that the dispute was essentially representational and should be handled under Section 8(b)(7) of the Act. It does not appear that the Board's conclusion is inconsistent with the statutory scheme or congressional policies or that it represents a marked departure from the Board's past decisions. This is not a case where the Board has refused to grant any relief for the employer or where the employer is placed in a dilemma caused by the complex factual situation. An employer may always file charges under Sections

8(b)(4)(B), 8(b)(4)(D) and 8(b)(7) if he is in doubt as to the nature of the dispute. Judicial review is available to insure that the Board does not abuse its discretion.

Finding no error in the Board's factual findings or its application of the law, I would uphold the Board's decision.