**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RECON REFRACTORY &
CONSTRUCTION INC.,
                    *Petitioner,*

INDUSTRIAL PROFESSIONAL &
TECHNICAL WORKERS INTERNATIONAL
UNION, SUINA, AFL-CIO,
          *Petitioner-Intervenor,*          No. 03-73064

            v.                              NLRB Nos.
                                            21-CD-635
NATIONAL LABOR RELATIONS                    21-CD-637
BOARD,
                    *Respondent,*            OPINION

INTERNATIONAL UNION, International
Union of Bricklayers and Allied
Craftworkers, and the International
Union of Bricklayers and Allied
Craftsworkers, Local 4,
          *Respondent-Intervenor.*

On Petition for Review of an Order of the
National Labor Relations Board

Argued and Submitted
March 7, 2005—Pasadena, California

Filed September 13, 2005

Before: Cynthia Holcomb Hall, Kim McLane Wardlaw, and
Richard A. Paez, Circuit Judges.

Opinion by Judge Paez

13117

**COUNSEL**

Steven D. Atkinson, Thomas A. Lenz, and Scott K. Dauscher, Cerritos, California, for the petitioner.

Howard Z. Rosen, Los Angeles, California, for petitioner-intervenor Industrial, Professional and Technical Workers International Union.

Margery E. Lieber, Eric G. Moskowitz, and Corrine E. Your-man, Washington, DC, for the respondent.

Daniel T. Purtell and Jeffrey B. Demain, San Francisco, California, for respondent-intervenor International Union of Bricklayers and Allied Craftworkers, Local 4.

## OPINION

PAEZ, Circuit Judge:

We are called upon to resolve a dispute between Recon Refractory & Construction Inc. ("Recon") and the International Union of Bricklayers & Allied Craftworkers, Local 4 ("Bricklayers" or "Local 4"). To decrease its labor costs, Recon reassigned work previously performed by Bricklayers members, and protected by the Bricklayers' collective bargaining agreement ("CBA"), to employees represented by the Industrial, Professional and Technical Workers International Union ("IPTW"). The dispute at issue is fundamentally a work-preservation dispute between Recon and the Bricklayers, not an inter-union jurisdictional dispute between the Bricklayers and the IPTW. Because Recon itself precipitated the dispute in an attempt to avoid its obligations to the Bricklayers, we deny Recon's petition for review of the National Labor Relations Board's ("Board") decision quashing notice of hearing under section 10(k) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(k). *Indus., Prof'l & Technical Workers Int'l Union* (*Recon Refractory*), 339 N.L.R.B. 825 (2003).

## I.[1]

---

[1]We derive this statement of facts from the Board's decision and order and from testimony taken at the hearing.

Dan Bellamy founded Recon, a refractory installation company,[2] in 1990. Shortly thereafter, the company signed on to the National Refractory Agreement ("NRA"), the Bricklayers' CBA, with the International Union of Bricklayers & Allied Craftworkers ("International"). Recon used Local 4 members to perform all refractory work for the next decade. Specifically, pursuant to the explicit terms of the NRA, Local 4 Bricklayers installed not just refractory brick, but "all refractory materials" including ceramic fiber (also known as Kao Wool), plastics, and spray insulation (or gunite). The NRA also included a clause preserving the Bricklayers' right to perform "all work which has been historically or traditionally assigned" to Bricklayers.[3]

In early 1995, the Bricklayers eliminated its class of

---

[2]Refractories are heat-resistant materials that are used to line high-temperature furnaces, reactors, and other processing units. *Recon Refractory*, 339 N.L.R.B. at 825 n.1.

[3]The full text of the NRA's work scope provision, which has remained unchanged through each revision and update, provides:

> The Employer agrees to assign to employees represented by [the Bricklayers] all work which has been historically or traditionally assigned to members of the International Union of Bricklayers and Allied Craftsmen, including but not limited to: dipping, setting, buttering, bedding, hanging, pointing, grouting, caulking, cutting, toothing, fitting, plumbing, aligning, laying, flagging, leveling, installation of gaskets and expansion joint material, grinding, vibrating, tamping, guniting, insulating, and spraying of all refractory materials, anchoring of all refractory materials by all means including bolting and welding, ceramic welding, removal and cleaning of masonry materials to be reinstalled, final sandblasting of surfaces to receive additional refractory materials, installation of chemical coatings, fire-proofing, and membrane materials by any method required, surface spraying of all refractory materials, and leaning of coke oven walls, chambers and flues. Temporary bracing in coke oven repairs shall be done by employees represented by [the Bricklayers], in coordination with other trades.

NRA Article II § C (1999).

unskilled members, or "bricklayers' helpers." Recon, how-ever, needed a union to represent those unskilled employees for a job at US Borax Company, which required that its contractors use union labor. Rather than using more expensive journeyman Bricklayers to do the unskilled work, Recon sought another union. On November 1, 1996, Recon entered into a site-specific "project deal" with the IPTW to provide unskilled laborers who would work with Bricklayers on the US Borax job. The IPTW-represented laborers performed only unskilled support tasks, and did not install brick or non-brick refractory materials. Furthermore, Recon's contract with the IPTW did not include a thorough work assignment or preservation clause. To the contrary, the IPTW contract simply stated: "Work assignments shall be entirely at the discretion of the Company without regard to seniority or classification." For the first several years of this arrangement, Recon assigned IPTW laborers support tasks, such as demolition, cleanup, and supply of refractory materials to Bricklayers for installation.

Recon's agreement with the IPTW was, as the Bricklayers describe it, "unusual." Bellamy testified that the company itself "pursued" the union to represent its unskilled laborers. Executives at Recon "made several phone calls, talked to some other contractors that were covered by collective bargaining agreements and eventually ended up with the IPTW." The IPTW-represented laborers were required to join the union and required to sign withdrawal cards to "deactivate" themselves from membership at the end of each job. Recon essentially paid those employees' union dues, increasing their pay to offset the added cost. Through these maneuvers, Recon ensured that its laborers were not represented by any union on any job other than US Borax.

Prompted by its customer Arco Refinery's demand for wage caps, Recon began negotiating with the Bricklayers in 1999 to decrease wage rates. On March 30, 1999, Bellamy requested that the Bricklayers International freeze the $0.75

per hour annual wage increase. The Bricklayers would not agree to concessions and would not do the work at the rates Recon proposed. In August, Recon again sought concessions, this time in the form of a 20% wage reduction, which the Bricklayers similarly refused. On August 16, Bellamy notified the Bricklayers of his intent to terminate the CBA effective November 14, 1999, or "as soon as permitted by law or contract." After negotiations reached an impasse on October 14, Bellamy reaffirmed his intent to terminate the CBA the following month. The NRA expired on November 14, 1999. On December 7, Frank Collins, president of Bricklayers Local 4, notified the union membership that Recon had refused to sign the current NRA and therefore left "no choice but to regard Recon as a non-signatory contractor."

While these negotiations were in process and before the NRA expired, Bellamy mentioned to David Bohannan, who worked with him at Recon, that he wanted to "giv[e] somebody else some of the Bricklayers work," and specifically mentioned the work in dispute.[4] "[Bellamy] figured if [the Bricklayers] are not going to give him a freeze he would just go ahead and get somebody else to do the work." Bohannan testified that Bellamy "personally told me he was going to stick it to the International and the Bricklayers especially Frank Collins. . . . [b]ecause they will not go his way, they will not help Recon out by taking a freeze on the wages." Mauro Romagnoli, a Bricklayers officer, testified that Bellamy told him that another union was claiming the Bricklayers work. When Romagnoli told Bellamy that would probably force a jurisdictional dispute, "he told me that is where he wanted it to go." "He assured me that this was just the tool to try and force Frank [Collins] and the International to do something in order to meet his demands of a lesser wage or special agreement, whatever he wanted at the time. And he assured me he could break it off at any time[—the] use of

---

[4]Bohannan testified that Bellamy "mentioned Kao Wool, castables, welding and ramming," and used the term "Bricklayers' work."

these other people to do the Bricklayers work." After the NRA expired in November, Recon expanded the scope of its agreement with the IPTW to include nine job sites in addition to the US Borax site, including Arco Refinery.[5]

On December 20, 1999, Recon signed a new contract with the Bricklayers, effective retroactively to November 14, 1999, which included the same scope of work provision as the 1990 agreement. In January 2000, however, the Bricklayers discovered that Recon was performing nonbrick refractory installation work—the work in dispute—at the Arco job site with non-Bricklayer employees,[6] without informing Local 4 as the NRA required. This was the first time since Recon's founding that employees other than Bricklayers had performed this type of refractory work. *Recon Refractory*, 339 N.L.R.B. at 828. The Bricklayers filed a grievance on January 28, 2000, alleging that the assignment of work to non-Bricklayers employees violated their contract with Recon.

Recon took the position that the scope of the Bricklayers' work included only refractory brick installation, and not installation of other refractory materials such as ceramic fiber. On February 1, Recon informed the IPTW of the Bricklayers' grievance and solicited the IPTW's response. The next day, the IPTW formally claimed jurisdiction over the disputed work and threatened "immediate economic action against Recon" should the Bricklayers perform the work. At a meeting on February 4, 2000, Recon informed the Bricklayers that it was assigning all nonbrick refractory installation work at its Arco Refinery job to the IPTW, and only brick work to the Bricklayers. At this meeting, the Bricklayers learned that

---

[5]The expanded list of IPTW-covered job sites included the Arco, Ultramar, Tosco, Chevron, Equilon, Mobil, Paramount Petroleum, and Chimco refineries, located mostly in Los Angeles.

[6]The Bricklayers believed at the time that these employees were non-union, and discovered only later that they were in fact represented by the IPTW.

Recon was signatory with the IPTW at jobs beyond the US Borax site, and that the employees performing the work in dispute were represented by the IPTW. The Bricklayers' representatives at that meeting disputed Recon's interpretation of the NRA's work assignment clause, and asserted their right to the work in dispute.

The Bricklayers filed a complaint in the district court against Recon on June 21, 2000, for breach of the CBA under 29 U.S.C. § 185(a).[7] When Recon informed the IPTW on July 31, 2000, of the Bricklayers' federal lawsuit, the IPTW again threatened to "take economic action, including picketing" to preserve its claim to the work should Recon reassign the work to the Bricklayers. The IPTW claimed that Kao Wool installation was the historic work of its union and continued to assert jurisdiction over the disputed work. The IPTW position echoed Recon's: "Bricklaying belongs to the Bricklayers" and all other types of refractory installation materials could be assigned to laborers. As noted above, however, Recon's contract with the IPTW provides only that "[w]ork assignments shall be entirely at the discretion of the Company without regard to seniority or classification." Recon has continued to use IPTW-represented employees to perform the disputed work during the pendency of this case.

In response to the IPTW's threats of economic action, Recon filed unfair labor practice charges with the Board on August 4, 2000. The Bricklayers filed a similar charge on November 16, 2000. Both Recon and the Bricklayers claimed that the IPTW violated § 8(b)(4)(D) of the NLRA, 29 U.S.C. § 158(b)(4)(D) ("§ 8(b)(4)(D)"), by engaging in proscribed activity with an object of forcing Recon to assign certain work to employees IPTW represents rather than to employees the Bricklayers represent.[8] A hearing officer of the Board heard

---

[7]The district court action was stayed on September 13, 2000, pending final resolution of this § 10(k) hearing.

[8]In relevant part, § 8(b)(4)(D) of the NLRA provides:

It shall be an unfair labor practice for a labor organization or its

the evidence summarized above during an eighteen-day hearing pursuant to NLRA § 10(k), 29 U.S.C. § 160(k) ("§ 10(k)"), which allows the Board to resolve jurisdictional disputes by making an award of the disputed work to one or the other of the competing unions.[9] Pursuant to Board procedure, the hearing officer transferred the case directly to the Board for decision. 29 C.F.R. §§ 101.34, 102.90. On July 24, 2003, the Board granted the Bricklayers' motion to quash notice of hearing. *Recon Refractory*, 339 N.L.R.B. at 828. The Board found that this dispute is not a jurisdictional dispute appropriate for resolution under § 10(k); instead, the dispute was "created by Recon's alleged breach of its contract with Local 4," and therefore "is a true work preservation dispute." *Id.*

## II.

Recon challenges the Board's decision to quash notice of hearing on two grounds. First, it claims that the Board's factual findings were not supported by substantial evidence. It also objects to the Board's authority to determine that Recon itself created the dispute with the Bricklayers. Second, Recon argues that the Board's legal conclusions are erroneous, and objects to the Board's decision to look beyond the literal vio-

---

agents . . . to threaten, coerce, or restrain any person engaged in commerce . . . , where . . . an object thereof is . . . forcing or requiring any employer to assign particular work to employees in a particular labor organization . . . rather than to employees in another labor organization . . .

29 U.S.C. § 158(b).

[9]Section 10(k) of the NLRA provides:

Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of [§ 8(b)(4)(D)], the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen . . .

29 U.S.C. § 160(k).

lation of § 8(b)(4)(D) to determine "the real nature and origin of the dispute." *Id.* at 827 (quotation marks omitted). We have jurisdiction over Recon's appeal from the Board's final order quashing notice of hearing under § 10(f) of the NLRA, 29 U.S.C. § 160(f). *Foley-Wismer & Becker v. NLRB* (*Foley-Wismer I*), 682 F.2d 770, 775 (9th Cir. 1982) (en banc). We reject each of Recon's arguments and affirm the Board's decision.

## A. Substantial Evidence Supports the Board's Factual Findings

After reviewing the evidence taken at a lengthy evidentiary hearing, the Board concluded that Bricklayers had performed the work in dispute at all times prior to Recon's reassignment in January 2000. *Recon Refractory*, 339 N.L.R.B. at 828. Specifically, the Board found that the Bricklayers' Local 4 members had

> performed the disputed work pursuant to the terms of the successive NRAs for a decade prior to January 2000. Consequently, when Recon assigned the work in dispute to IPTW-represented laborers at Arco, it was the first time that Recon had failed to assign refractory work in southern California to Local 4-represented bricklayers.

*Id.* The Board also found that the dispute was fundamentally of Recon's own making. *Id.* Recon maintains that there is no evidence to support these findings and that, in any event, the Board was not empowered to make such a determination. We disagree.

We review the Board's findings of fact for substantial evidence. NLRA § 10(e), 29 U.S.C. § 160(e). Under this standard, we must affirm where the relevant evidence is such that "a reasonable mind might accept [it] as adequate to support a conclusion"—even if it is possible to draw a contrary conclu-

sion from the evidence. *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the [agency]."); *cf. Waterway Terminals Co. v. NLRB*, 467 F.2d 1011, 1018-19 (9th Cir. 1972) (remanding a decision to quash notice of hearing as not supported by substantial evidence because the Board failed to consider relevant contrary evidence in the record). Reviewing for substantial evidence, we examine the Board's findings "with a deferential eye." *See Alderman v. SEC*, 104 F.3d 285, 288 (9th Cir. 1997).

[1] Although the Board ultimately quashed notice of the hearing, it made that decision after eighteen days of hearings eliciting substantial testimony and documentary evidence. *Recon Refractory*, 339 N.L.R.B. at 825. The facts underlying the dispute were clearly before the Board and were a primary subject of inquiry at the hearing; the Board's order quashing notice of hearing was based on those facts. The Board is empowered to make factual findings in the course of determining its own jurisdiction under §§ 8(b)(4)(D) and 10(k) and in determining whether an unfair labor practice has occurred within the meaning of those sections. Section 10(k) in fact explicitly "empower[s] and direct[s]" the Board "to hear and determine the dispute out of which [a charged] unfair labor practice shall have arisen." 29 U.S.C. § 160(k). We therefore find no basis for Recon's challenge to the Board's authority to decide such factual questions.

[2] Furthermore, our review of the record suggests that the evidence was more than sufficient to support the Board's findings. First, substantial evidence supports the finding that Bricklayers had performed the disputed work at all times prior to Recon's reassignment at the Arco job site.[10] Frank Collins,

---

[10]Recon asserts that from the very beginning, the division of labor was clear: "[B]ricklayers laid refractory brick and IPTW laborers performed all nonbrick installation work." But the only evidence to support the claim

for example, testified that to his knowledge, non-Bricklayer laborers never installed any refractory materials of any kind prior to this dispute. Although Bricklayers field representatives were charged with notifying Collins of changes in work assignments and ensuring that Bricklayers' work was not assigned to other employees, no field representative ever notified him of any such changes before January 2000. Kenneth Golden, a laborer foreman, testified that laborers did not perform installation of brick, ceramic fiber, castables, or any other refractory material. He testified that he did not see laborers performing refractory installation and that those tasks were performed by Bricklayers exclusively. Romagnoli confirmed these accounts in his testimony.

[3] Second, the Board's finding that Recon created the dispute is also supported by substantial evidence. As noted above, witnesses testified that Bellamy made his intentions quite clear: he wanted to force a jurisdictional dispute as a tool to gain wage concessions from the Bricklayers. He acknowledged that he was using IPTW-represented laborers "to do the Bricklayers work." And Bricklayer Paul Garcia testified that he spoke with Bellamy on November 30, 1999, who told him "if I wanted to come back to work that I was going to have to show the laborers how to do the Bricklayers' work." There is significant evidence in the record to support the finding that this dispute was created by Recon's alleged breach of its contract with the Bricklayers. We therefore reject Recon's objections to the Board's factual findings.

that laborers performed the work in dispute prior to 2000 comes from testimony of Recon executives, including Bellamy and Bohannan, which the Board did not credit. In addition, Recon's position is directly contrary to the express terms of the NRA itself, which preserves for Bricklayers the work of "guniting," "ceramic welding," and "spraying of *all refractory materials*" and "installation . . . *by any method required*" (emphasis added).

## B.   The Board's Legal Conclusions Were Not Arbitrary and Capricious

Based on these findings, the Board found this dispute inappropriate for resolution through a § 10(k) proceeding. *Recon Refractory*, 339 N.L.R.B. at 828. Although viewed literally the IPTW's threats did provide reasonable cause to believe that a violation of § 8(b)(4)(D) had occurred, the Board found that the *real* nature of the dispute was a contractual one between the Bricklayers and Recon over the preservation of bargaining unit work for the union that had traditionally performed it. *Id.* at 827. Citing the Board's prior decisions in *Teamsters Local 578* (*USCP-Wesco I*), 280 N.L.R.B. 818 (1986), *aff'd. sub nom. USCP-Wesco, Inc. v. NLRB* (*USCP-Wesco II*), 827 F.2d 581 (9th Cir. 1987), and *Teamsters Local 107* (*Safeway Stores*), 134 N.L.R.B. 1320 (1961), the Board concluded that

> [w]here a dispute is fundamentally one between an employer and a union, and concerns the union's attempt merely to preserve the work it previously had performed, the Board will not afford the employer the use of a 10(k) proceeding to resolve a dispute of its own making.

*Recon Refractory*, 339 N.L.R.B. at 827-28. Accordingly, the Board quashed notice of hearing and terminated the proceedings. *Id.* at 828.

Recon objects to this decision, arguing that the Board erred by considering whether the dispute was "actually jurisdictional" rather than simply determining whether "reasonable cause" existed to believe that a violation of § 8(b)(4)(D) had occurred. "[T]he Board's legal conclusions as to the jurisdictional dispute must be upheld unless arbitrary and capricious." *Foley-Wismer & Becker v. NLRB* (*Foley-Wismer II*), 695 F.2d 424, 427 (9th Cir. 1982). We have explained that this standard gives the Board "considerable deference" in interpreting the

NLRA and exercising its expertise. *USCP-Wesco II*, 827 F.2d at 583; *see also NLRB v. Int'l Longshoremen's and Warehousemen's Union, Local No. 50* (*Pacific Maritime Ass'n*), 504 F.2d 1209, 1218-19 (9th Cir. 1974). A Board decision is subject to reversal if it ignores a controlling legal standard. *USCP-Wesco II*, 827 F.2d at 583. However, " '[i]f the Board's construction of the statute is "reasonably defensible," it should not be rejected merely because the courts might prefer another view of the statute.' " *Id.* (quoting *Int'l Alliance of Theatrical and Stage Employees v. NLRB*, 779 F.2d 552, 555 (9th Cir. 1985)).

The Supreme Court explained the deferential nature of the arbitrary and capricious standard in *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Auto Insurance Company* as follows:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

463 U.S. 29, 43 (1983). The Court noted that the scope of review is narrow and that we "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (quotation marks omitted). Under this deferential standard, we find no error in the Board's decision.

**[4]** Ample precedent supports the Board's conclusion that an award of work under § 10(k) is not warranted where the dispute is not "actually jurisdictional." *Recon Refractory*, 339 N.L.R.B. at 827. Section 10(k) of the NLRA was enacted to provide a mechanism for resolving jurisdictional disputes

between competing unions. The Supreme Court recognized that the law was designed "to protect employers from being 'the helpless victims of quarrels that do not concern them at all.'" *NLRB v. Radio and Television Broad. Eng'rs Union, Local 1212* (*CBS*), 364 U.S. 573, 581 (1961) (quoting H.R. Rep. No. 80-245, at 23 (1947)). In *CBS*, the Court noted that the statutory scheme presumes "that the employer has been placed in a situation where he finds it impossible to secure the benefits of stability from either of these contracts, not because he refuses to satisfy the unions, but because the situation is such that he cannot satisfy them." *Id.* at 582. In short, § 10(k) was enacted to "protect employers trapped between two competing unions." *USCP-Wesco II*, 827 F.2d at 584. It was not, however, intended to authorize the Board to resolve disputes that are truly between an employer and a union. *Id.*

**[5]** With this goal of protecting innocent employers in mind, the Board has established a test for determining when a dispute is properly deemed jurisdictional and submitted to a § 10(k) hearing. The Board typically conducts a three-step inquiry to determine "whether there is reasonable cause to believe that § 8(b)(4)(D) of the Act has been violated." *Int'l Alliance of Theatrical and Stage Employees, Local Union No. 39* (*Shepard Exposition Services*), 337 N.L.R.B. 721, 723 (2002). This requires a finding of reasonable cause to believe that (1) a union has used a proscribed means—such as picketing or threatening to picket—to enforce its claim to the work in dispute; (2) there are competing claims to the disputed work between rival groups of employees; and (3) there is no agreed-upon method for resolving the dispute voluntarily. *Laborers Int'l Union of N. Am., Local No. 1184* (*Golden State Boring*), 337 N.L.R.B. 157, 158 (2001). When these requirements are met, the Board will award the disputed work to one or the other of the vying unions, based on considerations such as the employer's past practice, industry custom, and contract rights. *CBS*, 364 U.S. at 577, 579.

**[6]** In most situations where reasonable cause exists to believe § 8(b)(4)(D) has been violated, the Board is required to make an affirmative award of the work in dispute. *Id.* at 586. The Board, however, recognizes an exception to this rule upon a showing that " 'the union's members had previously performed the work in dispute and the union was not attempting to expand its work jurisdiction.' " *Shepard Exposition Services*, 337 N.L.R.B. at 723 (quoting *Teamsters Local 107* (*Reber-Friel Co.*), 336 N.L.R.B. 518, 521 (2001)) (referring to this exception as a "work preservation defense"). Thus, even when the three-part test outlined above is technically satisfied and "the dispute may literally fall within the terms" of the NLRA, the Board will occasionally, as it did here, quash notice of hearing on the ground that the dispute is not "actually jurisdictional" and therefore not amenable to resolution under § 10(k).[11] *See USCP-Wesco I*, 280 N.L.R.B.

---

[11]The Board's ruling in this case is consistent with a number of other Board decisions quashing notice of hearing under § 10(k) in similar circumstances. *See, e.g.*, *Int'l Ass'n of Machinists & Aerospace Workers, Dist. 190* (*SSA Terminal*), 344 N.L.R.B. No. 126, at 3 (2005), *available at* http://www.nlrb.gov/nlrb/shared_files/decisions/344/344-126.pdf (quashing notice of hearing after looking beyond the technical violation of § 8(b)(4)(D) to the "real nature and origin of the dispute"); *Int'l Bhd. of Elec. Workers Local 103* (*Buffalo Elec. Constr.*), 298 N.L.R.B. 937, 940 (1990) ("although the facts here may literally fall within the terms of Sections 8(b)(4)(D) and 10(k), we conclude that the real nature of this dispute is to retrieve jobs that were subcontracted, not to acquire new work"); *Plumbers and Gasfitters Local Union No. 36* (*Weinheimers, Inc.*), 219 N.L.R.B. 1016, 1018 (1975) (quashing notice of hearing where "the disagreement which led to the strike stemmed from a claim to unit work and the allegedly improper transfer of it out of the unit, rather than from the competing claims of groups of employees to work on jurisdictional grounds"); *Chicago Web Printing Pressmen's Union No. 7* (*Metropolitan Printing Co.*), 209 N.L.R.B. 320, 322 (1974) (quashing notice of hearing after determining that the dispute was over "unit work," and finding that "[t]o apply jurisdictional dispute principles to a unit work claim would distort the statute"); *Int'l Bhd. of Electrical Workers, Local 292* (*Franklin Broad. Co.*), 126 N.L.R.B. 1212, 1215 (1960) (quashing notice of hearing where the real dispute arose after the employer terminated a group of union employees and assigned their duties to another group of employees; the union's objective in picketing to gain back those jobs for its members was one "which the Congress, in enacting Section 8(b)(4)(D), did not intend to proscribe").

at 820. As the Board stated in *Safeway Stores*, "[c]ertainly it was not intended that every time an employer elected to reallocate work among his employees or supplant one group of employees with another, a 'jurisdictional dispute' exists within the meaning of" §§ 8(b)(4)(D) and 10(k). 134 N.L.R.B. at 1322. That is simply not the type of dispute Congress devised § 10(k) to resolve. *Id.* at 1323.

[7] The Supreme Court has recognized this exception with approval, noting that "the Board has adopted the position that jurisdictional strikes in support of contract rights do not constitute violations of [§] 8(b)(4)(D) despite the fact that the language of that section contains no provision for special treatment of such strikes." *CBS*, 364 U.S. at 577 n.12. We also have adopted this exception, affirming Board decisions quashing notice of hearing on the ground that the dispute was not truly jurisdictional, despite a literal violation of § 8(b)(4)(D).[12] *See*, *e.g.*, *USCP-Wesco II*, 827 F.2d at 584-85 (affirming a Board decision to quash notice of hearing under § 10(k) because it was precipitated by the employer's violation of its collective bargaining agreement and thus was not actually jurisdictional); *Foley-Wismer II*, 695 F.2d at 427-28 (affirming a Board decision to quash notice of hearing where no jurisdictional dispute existed because the work claimed by one union had never been performed or sought by the other

---

[12]The District of Columbia Circuit similarly applies § 10(k) only where an "employer faces a jurisdictional dispute that is not of his own making and in which he has no interest;" more specifically, that court has noted that "[w]here . . . the employer created the dispute, § 8(b)(4)(D) and § 10(k) do not apply." *Int'l Longshoremen's & Warehousemen's Union, Local 62-B v. NLRB (ILWU)*, 781 F.2d 919, 924, 925 (D.C. Cir. 1986). *ILWU* involved facts very similar to those presented here: the employer created the dispute and the two employee groups began their quarrel over the disputed work only *after* the employer reassigned it away from the group that traditionally had performed it. *Id.* at 925. The court declined to characterize the dispute as "jurisdictional" and amenable to § 10(k) resolution because such a rule would allow an employer to create a jurisdictional dispute at any time simply by reassigning work. *Id.*

union); *c.f. Waterway*, 467 F.2d at 1018 (remanding to the Board for a decision on the merits under § 10(k) because the Board's decision to quash was based on factual findings unsupported by the evidence).

There are good reasons for such a policy. As the Supreme Court noted, " 'to fail to hold as controlling the contractual preemption of the work in dispute would be to encourage disregard for observance of binding obligations under collective-bargaining agreements and invite the very jurisdictional disputes Section 8(b)(4)(D) is intended to prevent.' " *CBS*, 364 U.S. at 577 n.12 (quoting *Nat'l Ass'n of Broadcast Engineers* (*NBC*), 105 N.L.R.B. 355, 364 (1953)). The Board has applied this rule out of respect for the bargain struck between the union and the employer, as well as for the positive benefits of work preservation clauses which would otherwise be rendered unenforceable. *USCP-Wesco I,* 280 N.L.R.B. at 821 ("To hold that this dispute is a jurisdictional dispute to be decided by the Board would not allow the [union] employees the benefit of their negotiated work preservation clause."); *see also SSA Terminal*, 344 N.L.R.B. No. 126, at 3. We have endorsed that rationale, adding that the Board's decision to quash notice of hearing in such cases advances the Congressional policy favoring arbitration rather than Board resolution of labor disputes. *USCP-Wesco II*, 827 F.2d at 586 ("Too readily compelling Board resolution of labor disputes corrodes the congressional policy decision to favor arbitration of these disputes."). Finally, the quashing of a § 10(k) hearing does not leave an employer entirely without a remedy. As the Board has noted, employers who create disputes by their own actions "must use other means, such as arbitration, to resolve conflicting work claims." *United Bhd. of Carpenters and Joiners of Am., Local No. 13* (*First Chicago NBD Corp.*), 331 N.L.R.B. 281, 282 (2000).

This case is a far cry from the typical § 10(k) scenario in which the unions' quarrel "is of so little interest to the employer that he seems perfectly willing to assign work to

either if the other will just let him alone." *CBS*, 364 U.S. at 579. To the contrary, Recon intentionally created this dispute in an attempt to avoid its contractual obligations and lower its wage rates. Like *USCP-Wesco*, this case revolves around a contractual dispute between an employer and the only union whose members had historically performed the work in question. 280 N.L.R.B. at 818. And like *USCP-Wesco*, the Board based its decision to quash on the fact that "but for [the employer's] violation of the contract [the union] would not be in any position to claim the work . . . ." *Id.* at 819.

**[8]** To be sure, Recon *now* faces competing claims to the work in dispute by the Bricklayers and the IPTW.  But *Safeway Stores* held that where an employer creates a dispute by transferring work to another group of employees who had no *previous* claim to that work, the dispute is not "actually jurisdictional" in the statutory sense and the Board will not make a § 10(k) ruling.[13] 134 N.L.R.B. at 1323. Here, the IPTW's claim to the work very clearly postdates Recon's reassignment of the work in dispute. At the time of the reassignment, the Bricklayers were "the only group claiming the work." *ILWU*, 781 F.2d at 925. In *Safeway Stores*, the Board quashed notice of hearing because, like here, "[t]he real dispute is wholly between [the union] and [the employer] and concerns only [the union]'s attempt to retrieve the jobs of its

---

[13]In *NLRB v. Plasterers' Local Union No. 79*, 404 U.S. 116 (1971), the Supreme Court held that an employer is a party to a jurisdictional dispute and therefore must be afforded a chance to participate in § 10(k) proceedings. *Id.* at 126, 131. A settlement agreement between the two competing unions therefore cannot bind an unwilling employer. *Id.* at 131. The Court noted that under the "*Safeway* rule," when one union renounces its claim to the disputed work, "§ 10(k) proceedings are aborted despite legitimate interests an employer may have in securing a Board decision." *Id.* at 134. This is because "by definition, [a jurisdictional] dispute cannot exist unless there are rival claims to the work." *Id.* (quotation marks omitted). But the Court found the *Safeway* rule inapplicable in cases where the unions have agreed to arbitrate, because such an agreement is not equivalent to a union's disclaimer of the work. *Id.* at 136. Nothing in the Court's decision disturbs the Board's holding in *Safeway Stores*.

members, jobs which had been secured for more than 10 years by a series of collective-bargaining agreements until [the employer] suddenly terminated the bargaining relationship . . . ." 134 N.L.R.B. at 1323.

[9] Recon attempts to distinguish *Safeway Stores* and *USCP-Wesco*; there are, surely, certain factual differences among the cases. *USCP-Wesco*, for example, involved two employers and began as a dispute over subcontracting. 280 N.L.R.B. at 818. And in *Safeway Stores*, there was no indication that the union *receiving* the work had threatened or engaged in any economic action—instead, the picketing union was "attempt[ing] to retrieve the jobs of its members." 134 N.L.R.B. at 1323. But these factual distinctions did not affect the Board's reasoning in either case. Instead, the critical fact the Board relied on in each case was that the employer had created the dispute by its own unilateral actions.[14] *Id.*; *see USCP-Wesco I*, 280 N.L.R.B. at 822; *see also SSA Terminal*, 344 N.L.R.B. No. 126, at 4 (quashing notice of hearing because the employer "by its own unilateral actions . . . has created a work preservation dispute"). This case therefore falls clearly within the established precedent.

[10] Even if we had not decided that this case is squarely controlled by precedent, it is clear that the Board's reliance on *Safeway Stores* and *USCP-Wesco* is "reasonably defensible." *USCP-Wesco II*, 827 F.2d at 583. The determination that this case was not actually jurisdictional and therefore inappropriate for resolution under § 10(k) cannot be considered arbitrary and capricious. In sum, § 10(k) cannot be used as a tool to aid employers in avoiding their contractual obligations to

---

[14]The employers' actions also distinguish these cases from *Waterway*. The employer in *Waterway* reassigned work from non-employees to its own employees without violating any collective bargaining agreement. 467 F.2d at 1013; *see also USCP-Wesco II*, 827 F.2d at 585. No party in *Waterway* ever claimed that the employer had deliberately created the dispute in order to evade its contractual obligations. *Waterway* is therefore much less instructive here than either *Safeway Stores* or *USCP-Wesco*.

employees when the terms of those contracts become inconvenient. We agree with the Board that this dispute is not appropriate for resolution under § 10(k).

Recon's petition for review of the Board's decision and order quashing notice of hearing is therefore DENIED.